# No. 20-1955

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff – Counter-Defendant – Appellee,
v.

VICKRAM BEDI, PRESIDENT, DATALINK COMPUTER PRODUCTS, et al.
Defendants – Counter-Claimants – Appellants,

_____

On Appeal from the United States District Court
for the Northern District of New York,
Hon. David N. Hurd

_____

**BRIEF FOR PLAINTIFF – COUNTER-DEFENDANT – APPELLEE
UNITED STATES OF AMERICA**

_____

STANLEY E. KEEN
Deputy Solicitor for National Operations

JENNIFER S. BRAND
Associate Solicitor

RACHEL GOLDBERG
Counsel for
Appellate Litigation

JESSE Z. GRAUMAN
Senior Attorney
U.S. Department of Labor
Office of the Solicitor
Room N-2716
200 Constitution Ave., N.W.
Washington, D.C. 20210
(202) 693-5563
grauman.jesse.z@dol.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

JURISDICTIONAL STATEMENT .............................................................................1

STATEMENT OF THE ISSUES.................................................................................2

STATEMENT OF THE CASE.....................................................................................2

   I.    STATUTORY AND REGULATORY FRAMEWORK ...............................2

      A.  The Department of Labor's Enforcement of Wage Obligations Under the H-1B Visa Program ...................................................................................2

      B.  The Federal Debt Collection Procedures Act....................................7

   II.   FACTUAL BACKGROUND .........................................................................8

      A.  Defendants' Participation in the H-1B Program and Resulting Obligations....................................................................................................9

      B.  Defendants' Failure to Pay Ingvarsdóttir the Required Wage ....................10

      C.  Criminal Activity by Defendants and Ingvarsdóttir...................................11

      D.  Evidence of Ingvarsdóttir's Coercive Employment Relationship and Bedi's Abuse ...........................................................................................................12

   III. PROCEDURAL HISTORY ........................................................................14

      A.  Administrative Proceedings .......................................................................14

      B.  Defendants' Opposition to Ingvarsdóttir's Efforts to Enforce the ARB's Order in State Court..................................................................................16

      C.  District Court Proceedings .........................................................................18

SUMMARY OF THE ARGUMENT ........................................................................20

ARGUMENT ...........................................................................................................23

   I.    STANDARD OF REVIEW.........................................................................23

   II.  DEFENDANTS' OBLIGATION IS SUBJECT TO THE FEDERAL DEBT COLLECTION PROCEDURES ACT. ..........................................................23

      A.  Like the Back-Wage Award in *E.D.P.*, Defendants' Debt Is an Amount Owing to the United States under the FDCPA Because It Is a Public Obligation, Not a Purely Private One............................................................23

i

B.   The District Court's Decision and *E.D.P.* Are Consistent with the Text and Purpose of the FDCPA and INA. ...................................................................................27

1.   The Language of the FDCPA Indicates that the Critical Factor in Determining Whether an Obligation Is a Debt Under the FDCPA Is What the Debt's Source Is, Not the Party to Whom the Amount Ultimately May Flow. ...................................................................................27

2.   The Source of Defendants' Debt Is the INA and Defendants' LCAs, Not Any Private Contract with Ingvarsdóttir.................................................32

3.   Neither the FDCPA's Language Nor Its Purpose Limits Debts Under the Statute to Those That Benefit the United States Financially.................35

4.   *Nathanson* Is Not Inconsistent with *E.D.P.* ...........................................39

C.   *E.D.P.* Is Not Limited to Circumstances Where the Government is the Only Party that Can Enforce the Underlying Order, and Even if it Were, Defendants' Contention that Ingvarsdóttir Can Enforce the ARB's Order Is Both Unsupported and Barred by Judicial Estoppel. ...................................................................................43

III. DEFENDANTS HAVE FAILED TO SHOW THAT THE *IN PARI DELICTO* DOCTRINE PRECLUDES THE UNITED STATES FROM ENFORCING THE ARB'S ORDER. ...................................................................................48

A.   The Plaintiff in This Action—the United States—Participated in No Wrongdoing and Does Not Stand in Ingvarsdóttir's Shoes. ...........................48

B.   Even if Ingvarsdóttir's Conduct Could be Imputed to the United States, Defendants Have Failed To Show, as They Must Under This Affirmative Defense, that the Debt Sought in This Action Resulted from the Criminal Activity at Issue or that Any Misconduct by Ingvarsdóttir Is Equal to Their Own Misconduct.....................................................................................51

CONCLUSION ...................................................................................57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND  TYPE STYLE REQUIREMENTS .........59

CERTIFICATE OF SERVICE ...................................................................................60

ADDENDUM ...................................................................................61

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Adm'r v. Efficiency Corp.*,
   ARB Case No. 15-005, 2016 WL 4718917 (ARB Aug. 4, 2016)........................56

*Amalgamated Util.. Workers v. Consol. Edison Co.*,
   309 U.S. 261 (1940)................................................................. 23, 25–26

*Atl. Limousine Inc. v. NLRB*,
   243 F.3d 711 (3d Cir. 2011) ................................................................55

*Biran v. JP Morgan Chase & Co.*,
   No. 02-civ-5506, 2002 WL 31040345 (S.D.N.Y. Sept. 12, 2002)........................7

*BrandAid Mtkg. Corp. v. Biss*,
   462 F.3d 216 (2d Cir. 2006) ........................................................ 51–54

*California v. FERC*,
   495 U.S. 490 (1990)................................................................43

*Compunnel Software Grp., Inc. v. Gupta*,
   No. 14-civ-4790, 2015 WL 1224298 (S.D.N.Y. Mar. 17, 2015) .......................34

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)................................................................54

*Cyberworld Enter. Tech., Inc. v. Napolitano*,
   602 F.3d 189 (3d Cir. 2010) .................................................. 24–25, 56

*Deem v. DiMella-Deem*,
   941 F.3d 618 (2d Cir. 2019) ...........................................................43

**Page**

**Cases--Continued:**

*Diamond v. Chakrabarty*,
  447 U.S. 303 (1980)............................................................ 35–36

*Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*,
  609 F.3d 111 (2d Cir. 2010) .............................................. 36–37

*F.D.I.C. v. Giammettei*,
  34 F.3d 51 (2d Cir. 1994) ............................................ 49, 51, 54

*FTC v. Nat'l Bus. Consultants, Inc.*,
  376 F.3d 317 (5th Cir. 2004) ..................................... 29–30, 32

*G4S Int'l Emp't Servs. (Jersey), Ltd. v. Newton-Sealey*,
  975 F.3d 182 (2d Cir. 2020) ..................................................49

*Gupta v. Perez*,
  101 F. Supp. 3d 437 (D.N.J. 2015)......................... 25, 33–34

*Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997)...............................................39

*Hartman Bros. Heating & Air Conditioning v. NLRB*,
  280 F.3d 1110 (7th Cir. 2002) ..............................................55

*Ingvarsdóttir v. Bedi*,
  No. 155571-2016, 2016 WL 7031446, 2016 N.Y. Slip Op. 32359(U),
  (Sup. Ct. N.Y. County Dec. 2, 2016) (*Ingvarsdóttir I*) ..................... 16, 17, 45–46

*Ingvarsdóttir v. Bedi,*
  No. 155571-2016, 2017 WL 1438265
  (Sup. Ct. N.Y. County Apr. 24, 2017) (*Ingvarsdóttir II*) .................. 17, 18, 46, 47

iv

**Page**

**Cases--Continued:**

*Jacoby-Bender, Inc. v. Jacques Kreisler Mfg. Corp.*,
   287 F. Supp. 134 (S.D.N.Y. 1968) ..................................................................52

*Jinna v. MPRSoft, Inc.*,
   ARB Case No. 2019-0070, 2020 WL 2319034 (ARB April 15, 2020) .................4

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) .................................................... 19–20, 57

*King v. Time Warner Cable Inc.*,
   894 F.3d 473 (2d Cir. 2018) ..................................................................37

*Kolbusz-Kijne v. Tech. Career Inst.*,
   No. 93-LCA-0004, 1994 WL 897284
   (DOL Off. Admin. Appeals July 18, 1994) ........................................................3

*Kutty v. U.S. Dep't of Labor*,
   No. 3:05-cv-510, 2011 WL 3664476 (E.D. Tenn. Aug. 19, 2011) ............... 26, 33

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*,
   753 F.3d 395 (2d Cir. 2014) ..................................................................41

*McBride v. Estis Well Serv., LLC*,
   768 F.3d 382 (5th Cir. 2014) .................................................... 38–39

*McKennon v. Nashville Banner Pub. Co.*,
   513 U.S. 352 (1995)............................................................ 54–55

*Mullins v. New York*,
   653 F.3d 104 (2d Cir. 2011) ..................................................................23

**Page**

**Cases--Continued:**

*Nathanson v. NLRB,*
  344 U.S. 25 (1952)............................................................ 21, 39–42

*N.L.R.B. v. Consol. Bus Transit, Inc.,*
  577 F.3d 467 (2d Cir. 2009) ...........................................................26

*N.L.R.B. v. E.D.P. Med. Comput. Sys., Inc.,*
  6 F.3d 951 (2d Cir. 1993) ...................................................... passim

*New Hampshire v. Maine,*
  532 U.S. 742 (2001)............................................................. 46–47

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers &*
    *Lybrand, LLP,*
      322 F.3d 147 (2d Cir. 2003)..................................................49

*PenneCom B.V. v. Merrill Lynch & Co., Inc.,*
  372 F.3d 488 (2d Cir. 2004) ...........................................................57

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.,*
  392 U.S. 134 (1968)........................................................ 54, 56–57

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Sec. LLC),*
  721 F.3d 54 (2d Cir. 2013) ...........................................................50

*Pinter v. Dahl,*
  486 U.S. 622 (1988)...................................................................51

*Republic of Iraq v. ABB AG,*
  768 F.3d 145 (2d Cir. 2014) ............................................... 48, 56–57

vi

**Page**

**Cases--Continued:**

*S.E.C. v. ICP Asset Mgmt., LLC,*
  No. 10-civ-4791, 2012 WL 204098 (S.D.N.Y. 2012)...........................................37

*Shah v. N.Y. Off. of Mental Health,*
  523 F. App'x 828, 2013 WL 1846524 (2d Cir. May 3, 2013) ...............................7

*Shah v. Wilco Systems, Inc.,*
  126 F. Supp. 2d 641 (S.D.N.Y. 2000) .......................................................7

*Shannon v. N.Y.C. Transit Auth.,*
  332 F.3d 95, 99 (2d Cir. 2003) ...........................................................45

*Shearson Lehman Hutton, Inc. v. Wagoner,*
  944 F.2d 114 (2d Cir. 1991) ..............................................................50

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.,*
  509 F.3d 216 (5th Cir. 2007) ..................................... 28–32, 34, 35, 42

*Theodoropoulos v. I.N.S.,*
  358 F.3d 162 (2d Cir. 2004) ..............................................................41

*U.S. Small Bus. Admin. v. Bensal,*
  853 F.3d 992 (9th Cir. 2017) ..................................................... 28, 34

*United States v. Bongiorno,*
  106 F.3d 1027 (1st Cir. 1997)..................................... 30–32, 34, 42

*United States v. Bedi,*
  No. 1:17-cv-1168, 2019 WL 356546 (N.D.N.Y. Jan. 28, 2019)..........................18

*United States v. Cleveland Indians Baseball Co.,*
  532 U.S. 200 (2001).......................................................................41

**Page**

**Cases--Continued:**

*United States v. State Bank of N.C.*,
    31 U.S. 29 (1832)...................................................................................41

*United States v. Veal*,
    No. 04-0755-cv-w-dw, 2005 WL 1532748 (W.D. Mo. June 28, 2005)...............38

*United States v. Watkins*,
    940 F.3d 152 (2d Cir. 2019) ........................................................ 40–41

*Uzdavines v. Weeks Marine, Inc.*,
    418 F.3d 138 (2d Cir. 2005) ...................................................................47

*Varess v. Persian Broad. Serv. Global, Inc.*,
    ARB Case No. 2018-0023, 2019 WL 5102146 (ARB Sept. 26, 2019)................56

*Venkatraman v. REI Sys., Inc.*,
    417 F.3d 418 (4th Cir. 2005) ...............................................................7, 25

*Watson v. Bank of Am.*,
    196 F. App'x 306, 2006 WL 2482845 (5th Cir. 2006)...................................7, 25

*WHD v. Integrated Geophysics, Corp.*,
    ARB Case No. 2019-0001, 2020 WL 3146470 (ARB May 13, 2020) ...............56

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ...................................................................50

*Yates v. United States*,
    574 U.S. 528 (2015)...............................................................................40

**Page**

**Briefs:**

*FTC v. Nat'l Bus. Consultants, Inc.*,
  Reply Brief for Appellants, 2004 WL 2619617 (5th Cir. filed Jan. 12, 2004) ....30

*FTC v. Nat'l Bus. Consultants, Inc.*,
  Brief for the Appellee, 2003 WL 23873977 (5th Cir. filed Dec. 23, 2003).........30

*Ingvarsdóttir v. Bedi,*
  Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. CPLR 3212,
  2017 WL 1542177 (Sup. Ct. N.Y. County filed Jan. 3, 2017)...................... 16, 17

*Ingvarsdóttir v. Bedi,*
  Defs.' Mem. in Supp. Cross-Mot. to Dismiss,
  2017 WL 1542178 (Sup. Ct. N.Y. County filed Feb. 10, 2017) ....... 17–18, 45–46


**Federal Statutes:**

Immigration and Nationality Act,
  8 U.S.C. § 1101(a)(15)(H)(i)(b) ...............................................................3
  8 U.S.C. § 1182(a)(5)(A)...........................................................................7
  8 U.S.C. § 1182(n) .....................................................................................3
  8 U.S.C. § 1182(n)(1) ..................................................................... 4, 5, 34
  8 U.S.C. § 1182(n)(1)(A)(i) ........................................................ 3, 5, 26, 33
  8 U.S.C. § 1182(n)(2) .................................................................................5
  8 U.S.C. § 1182(n)(2)(C) ...........................................................................39
  8 U.S.C. § 1182(n)(2)(B) .............................................................................6
  8 U.S.C. § 1182(n)(2)(C)(vii) ...............................................................4, 26
  8 U.S.C. § 1182(n)(2)(D) .............................................................................6
  8 U.S.C. § 1324a........................................................................................34

**Page**

**Federal Statutes--Continued:**

18 U.S.C. § 228(d)(1)(A) (1994) ................................................................31

28 U.S.C. § 1291 .......................................................................................1
28 U.S.C. § 1294(1) ...................................................................................1
28 U.S.C. § 1331 .......................................................................................1
28 U.S.C. § 1345 .......................................................................................1

Federal Debt Collection Procedures Act,
    28 U.S.C. §§ 3001–3308.......................................................................1, 7
    28 U.S.C. § 3001(a) ...............................................................................37
    28 U.S.C. § 3001(a)(1)..........................................................................7, 28
    28 U.S.C. § 3002(3) ...............................................................................8, 40
    28 U.S.C. § 3002(3)(A) .........................................................................24
    28 U.S.C. § 3002(3)(B).........................................................................24, 27
    28 U.S.C. § 3004 ...................................................................................7
    28 U.S.C. § 3015...................................................................................7–8
    28 U.S.C. §§ 3101–05............................................................................8
    28 U.S.C. §§ 3201–06............................................................................8
    28 U.S.C. §§ 3301–08............................................................................8

29 U.S.C. § 160(c) ....................................................................................26

31 U.S.C. § 191 (1952) ..............................................................................40

42 U.S.C. § 3614 .......................................................................................39

x

**Page**

**Code of Federal Regulations:**

8 C.F.R. § 214.14 ................................................................................13

20 C.F.R. part 655 subparts H & I ......................................................3
20 C.F.R. part 655 subpart I................................................................5
20 C.F.R. § 655.700(b)(2)–(3) ............................................................5
20 C.F.R. § 655.705(a)(2) ...................................................................5
20 C.F.R. § 655.730(a)........................................................................4
20 C.F.R. § 655.730(d)(1)....................................................................5
20 C.F.R. § 655.731(c)(2)(i)–(iv) ......................................................10
20 C.F.R. § 655.731(c)(7)...............................................................4, 26
20 C.F.R. § 655.731(c)(7)(ii)...............................................................4
20 C.F.R. § 655.740(a)(1) ...................................................................5
20 C.F.R. § 655.800(b) .......................................................................6
20 C.F.R. § 655.805(a)(2) ...................................................................5
20 C.F.R. § 655.806 ............................................................................6
20 C.F.R. § 655.806(a)(2)..................................................................25
20 C.F.R. § 655.810(a)........................................................................6
20 C.F.R. § 655.810(f) ...................................................................7, 39
20 C.F.R. § 655.815 ............................................................................6
20 C.F.R. § 655.820 ........................................................................6, 25
20 C.F.R. § 655.825 ............................................................................6
20 C.F.R. § 655.840 ............................................................................6
20 C.F.R. § 655.845 ........................................................................6, 25

29 C.F.R. part 18 ................................................................................6

xi

**Page**

**Federal Register:**

Alien Temporary Employment Labor Certification Process,
56 Fed. Reg. 11,705 (Mar. 20, 1991) ..................................................................39

Labor Condition Applications and Requirements for Employers Using
Nonimmigrants on H-1B Visas in Specialty Occupations and as Fashion Models,
59 Fed. Reg. 65,646 (Dec. 20, 1994)...................................................................4

Labor Condition Applications and Requirements for Employers Using
Aliens on H-1B Visas in Specialty Occupations and as Fashion Models; Labor
Certification Process for Permanent Employment of Aliens in the United States,
65 Fed. Reg. 80,110 (Dec. 20, 2000) ...................................................... 3, 24, 33

Delegation of Authority and Assignment of Responsibility to the Administrative
Review Board,
77 Fed. Reg. 69,378 (Nov. 16, 2012) ...................................................................6

Secretary's Order 01-2020, Delegation of Authority and Assignment of Review
Board,
85 Fed. Reg. 13,186 (Mar. 6, 2020) ....................................................................6

**Page**

**Other Authorities:**

136 Cong. Rec. H13288-02 (Oct. 27, 1990)......................................................... 28, 36

H.R. Rep. 101-736 (Sept. 21, 1990) .................................................................. 36, 37

H.R. Rep. No. 103-883 (Jan. 2, 1995) ............................................................. 36–37

N.Y. Civil Practice Law & Rules,
   Rule 3212 ............................................................................................ 17, 45
   Rule 3213 ...................................................................................... 16, 17, 45

N.Y. Gen. Oblig. L. § 5-701(a)(1) ........................................................................33

N.Y. Penal Law §§ 155.40, 155.42........................................................................53

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the final order of the United States District Court for the Northern District of New York under 28 U.S.C. §§ 1291 and 1294(1). The district court had jurisdiction under both 28 U.S.C. § 1331, because the United States brought this action under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001–3308, and 28 U.S.C. § 1345, because the United States is the plaintiff.

## STATEMENT OF THE ISSUES

1. Whether the district court properly concluded that the Federal Debt Collection Procedures Act authorizes the United States to collect a back-wage debt owed by Defendants that will benefit Defendants' former employee, where Defendants owe the amount due to their violation of the H-1B provisions of the Immigration and Nationality Act, and where the U.S. Department of Labor assessed the violation and back wages in an administrative adjudication pursuant to its exclusive statutory enforcement authority.

2. Whether the district court correctly concluded that Defendants could not avoid summary judgment on their affirmative defense of *in pari delicto*, where Defendants alleged no wrongdoing by the United States, where the United States does not "stand in the shoes" of the employee who committed the wrongdoing, where the wrongdoing was separate and distinct from Defendants' H-1B violations, and where Defendants failed to show that the employee's wrongdoing was at least substantially equal to their own.

## STATEMENT OF THE CASE

I. **STATUTORY AND REGULATORY FRAMEWORK**

### A. The Department of Labor's Enforcement of Wage Obligations Under the H-1B Visa Program

The H-1B visa provisions of the Immigration and Nationality Act ("INA") allow employers to bring temporary workers to the United States to perform

2

"specialty occupations." 8 U.S.C. § 1101(a)(15)(H)(i)(b). Congress created certain labor standards that employers must satisfy when employing H-1B workers, and delegated authority to the Department of Labor ("DOL") to implement and enforce those standards. 8 U.S.C. § 1182(n); 20 C.F.R. part 655 subparts H & I.

As relevant here, employers must pay H-1B workers at least the required wage, which is the higher of (1) "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or (2) "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i). By setting a floor for the wages of H-1B workers, Congress sought "to protect U.S. workers' wages and eliminate any economic incentive or advantage in hiring temporary foreign workers." Labor Condition Applications and Requirements for Employers Using Nonimmigrants on H-1B Visas in Specialty Occupations and as Fashion Models; Labor Certification Process for Permanent Employment of Aliens in the United States, 65 Fed. Reg. 80,110, 80,110 (Dec. 20, 2000); *see also Kolbusz-Kijne v. Tech. Career Inst.*, No. 93-LCA-0004, 1994 WL 897284, at *7 (DOL Off. Admin. Appeals July 18, 1994) ("The intent of the labor condition application provisions was to protect the wages and working conditions of H-1B workers, and thereby, also protect the wages and working conditions of U.S. workers similarly employed.").

Congress established certain safeguards as part of these wage requirements. Most notably, H-1B employees must be paid even for nonproductive time, unless the nonproductivity is for the employee's convenience or due to non-work-related factors rendering the employee unable to work. 8 U.S.C. § 1182(n)(2)(C)(vii); 20 C.F.R. § 655.731(c)(7). This requirement runs from the time an H-1B worker enters into employment until the employer effects a *bona fide* termination by (1) informing the employee that her employment has been terminated, (2) notifying immigration officials at the Department of Homeland Security ("DHS") so DHS can cancel the employee's visa petition, and (3) paying for transportation back to the employee's home country where appropriate. *Jinna v. MPRSoft, Inc.*, ARB Case No. 2019-0070, 2020 WL 2319034, at *5 n.4 (ARB Apr. 15, 2020); 20 C.F.R. § 655.731(c)(7)(ii). These special requirements seek to prevent the H-1B program from "provid[ing] an avenue for nonimmigrants to enter the U.S. and await work at the employer's choice or convenience" and potentially supplant American workers. Labor Condition Applications and Requirements for Employers Using Nonimmigrants on H-1B Visas in Specialty Occupations and as Fashion Models, 59 Fed. Reg. 65,646, 65,656 (Dec. 20, 1994).

An employer seeking to hire an H-1B worker must first submit a Labor Condition Application ("LCA") to DOL. 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730(a); SA45–48, 52–55 (LCAs filed by Datalink Computer Products and

4

Vickram Bedi (collectively, "Defendants") in this case).[1]  The LCA contains

certain attestations, including that the employer will pay the greater of the

prevailing or actual wage.  8 U.S.C. § 1182(n)(1)(A)(i); 20 C.F.R. § 655.730(d)(1);

SA47, 54.  After reviewing the LCA, DOL signs and certifies it unless it is

incomplete or obviously inaccurate.  8 U.S.C. § 1182(n)(1); 20 C.F.R.

§ 655.740(a)(1); SA48, 55.  An LCA is not signed by, and does not specify the

name(s) of, the H-1B employee(s) who will fill the position(s) at issue.  SA45–48,

52–55.  After DOL certifies an employer's LCA, the employer submits to DHS a

nonimmigrant visa petition for the individual who will perform the work outlined

in the LCA, and if the petition is approved, the nonimmigrant applies to the

Department of State for a visa.  20 C.F.R. § 655.700(b)(2)–(3).

Congress delegated enforcement of the H-1B labor standards to DOL, which

has developed a comprehensive administrative process for this enforcement, set out

in regulations.  8 U.S.C. § 1182(n)(2); 20 C.F.R. part 655 subpart I.  The

Administrator of DOL's Wage and Hour Division ("WHD") has authority to

investigate and determine whether an H-1B employer has failed to pay wages as

required.  20 C.F.R. §§ 655.705(a)(2), 655.805(a)(2).  As relevant here, when an

---

[1] As appropriate, this brief cites to the Joint Appendix ("JA") filed on October 26, 2020, and the Supplemental Appendix ("SA") filed contemporaneously with this brief pursuant to this Court's order of September 9, 2020.

5

"aggrieved party" files an unpaid wage complaint with WHD, WHD must conduct an investigation if it finds reasonable cause to do so. 20 C.F.R. §§ 655.800(b), 655.806. If WHD determines that an employer has failed to pay the required wages, WHD must notify the employer and complainant of its determination and "assess and oversee the payment of back wages . . . to any H-1B nonimmigrant who has not been paid . . . as required." 20 C.F.R. § 655.810(a); *see also id.* § 655.815; 8 U.S.C. § 1182(n)(2)(B), (D).

Any interested party, including the employer and employee, may request review of WHD's determination by an administrative law judge ("ALJ"), who conducts an evidentiary hearing and then issues a decision and order. 20 C.F.R. §§ 655.820, 655.825, 655.840; *see generally* 29 C.F.R. part 18 (rules of practice and procedure before DOL ALJs). Parties may appeal the ALJ's decision to DOL's Administrative Review Board ("ARB"), an administrative appellate body authorized to issue final orders on behalf of the Secretary of Labor. 20 C.F.R. § 655.845; Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 77 Fed. Reg. 69,378 ¶ 5(c)(26) (Nov. 16, 2012).[2]

---

[2] Recently, DOL adopted a process by which the Secretary of Labor may undertake discretionary review of ARB decisions. Secretary's Order 01-2020, Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 85 Fed. Reg. 13,186, 13,187–13,188 (Mar. 6, 2020). This procedure did not apply to the ARB's decision here.

H-1B back wages are "immediately due for payment . . . upon the assessment by [WHD]" or, if review is requested, upon the decision of the ALJ or ARB.  20 C.F.R. § 655.810(f).

As the statute and the regulations demonstrate, there is no private right of action to enforce an employer's compliance with the LCA or the underlying statutory and regulatory requirements; rather, DOL possesses exclusive authority to do so under the procedures explained above.  *See*, *e.g.*, *Watson v. Bank of Am.*, 196 F. App'x 306, 307–08, 2006 WL 2482845, at *1 (5th Cir. 2006) (unpublished); *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 422–24 (4th Cir. 2005); *Biran v. JP Morgan Chase & Co.*, No. 02-civ-5506, 2002 WL 31040345, at *3 (S.D.N.Y. Sept. 12, 2002) (unpublished); *Shah v. Wilco Sys., Inc.,* 126 F. Supp. 2d 641, 647–48 (S.D.N.Y. 2000); *cf. Shah v. N.Y. State Off. of Mental Health*, 523 F. App'x 828, 831, 2013 WL 1846524, at *2 (2d Cir. May 3, 2013) (unpublished) (no private right of action under 8 U.S.C. § 1182(a)(5)(A)).

### B.  The Federal Debt Collection Procedures Act

The Federal Debt Collection Procedures Act of 1990 ("FDCPA") "provides the exclusive civil procedures for the United States to recover a judgment on a debt" except where otherwise specified in federal law.  28 U.S.C. § 3001(a)(1); *see generally* 28 U.S.C. §§ 3001–3308.  It sets forth detailed procedures, including nationwide service of process, *id.* § 3004; discovery about the financial condition

of a debtor, *id.* § 3015; prejudgment remedies, including attachment, receivership, garnishment, and sequestration, *id.* §§ 3101–05; postjudgment remedies, including judgment liens, execution, and installment payment orders, *id.* §§ 3201–06; and remedies for fraudulent transfers, *id.* §§ 3301–08. The procedures in the FDCPA apply to any "debt," defined as:

> (A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or
>
> (B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States; and includes any amount owing to the United States for the benefit of an Indian tribe or individual Indian, but excludes any amount to which the United States is entitled under section 3011(a).

*Id.* § 3002(3). This Court, in the context of the National Labor Relations Act ("NLRA"), has held that this definition can encompass a back-wage debt an employer owes as a result of a federal agency's administrative enforcement action pursuant to a federal statute. *N.L.R.B. v. E.D.P. Med. Comput. Sys., Inc.*, 6 F.3d 951, 954–55 (2d Cir. 1993) ("*E.D.P.*").

## II.    FACTUAL BACKGROUND

The essential facts of this case are undisputed. As detailed in the record below, and as Defendants do not contest on appeal, Defendants failed to pay Helga

Ingvarsdóttir, an H-1B nonimmigrant worker, the wages required by the INA and their LCAs, giving rise to the back-wage debt that is at the center of this action.

### A. Defendants' Participation in the H-1B Program and Resulting Obligations

Defendant Datalink Computer Products, Inc. ("Datalink") built, sold, and serviced computers. JA106, 134 ¶ 3; SA4, 19. Defendant Vickram Bedi was Datalink's President from 1995 to 2010 and the company's sole shareholder. JA106, 134 ¶ 4; SA4, 19.

On March 1, 2005, Bedi, as President of Datalink, signed an LCA, promising under penalty of perjury to pay one H-1B employee at least the prevailing wage of $61,152 yearly to work as an Account Executive. JA134 ¶ 7; SA45–48. DOL certified Defendants' LCA. JA135 ¶ 8; SA48. Datalink then petitioned DHS for, and received approval for, an H-1B visa for Ingvarsdóttir, a native of Iceland, valid from May 20, 2005 through May 15, 2008. JA135 ¶ 9; SA50.

On May 8, 2008, Bedi, on behalf of Datalink, signed a second LCA, promising to pay one H-1B employee at least the prevailing wage of $59,717 annually through May 2011 to work as an International Account Executive. JA135 ¶ 10; SA52–55. DOL certified Defendants' second LCA, and Defendants successfully petitioned for a three-year extension of Ingvarsdóttir's H-1B visa. JA135 ¶¶ 11–12; SA55, 57. Defendants never asked DHS to cancel Ingvarsdóttir's

H-1B visa, nor did they inform her that her employment was terminated, prior to her visa's expiration in May 2011.  JA139–40 ¶¶ 31i, 33; SA5, 22.

Bedi was Ingvarsdóttir's only supervisor, and no one else worked for Datalink besides a technician, a cleaner, and Bedi's mother.  JA134 ¶ 6, 138–39 ¶ 31a; SA19–21.  Ingvarsdóttir testified that Bedi hired her to "do anything [he] specified."  JA138–39 ¶ 31; SA19.  While she performed sales, administrative, and other work at Datalink, Ingvarsdóttir also did considerable work at Bedi's home, where she also lived.  JA134 ¶ 5, 139 ¶ 31b; SA19, 21, 23–25.

## B. Defendants' Failure to Pay Ingvarsdóttir the Required Wage

Defendants failed to pay Ingvarsdóttir the required wage under the H-1B statute and regulations.  Payments qualify as wages paid under the H-1B program only if they are documented as earnings in the employer's payroll records and reported as the employee's earnings, with appropriate withholdings and taxes paid, to federal, state, and local tax authorities.  20 C.F.R. § 655.731(c)(2)(i)–(iv).  During the administrative proceedings below, Datalink failed to produce any payroll records, and tax records obtained from the Internal Revenue Service ("IRS") and New York State did not show any withholdings, or any wages paid to Ingvarsdóttir, for 2005, 2007, 2008, or 2010.  JA109, 137–38 ¶¶ 23–28; SA10–14, 17–18, 70, 75.  For 2006, although Datalink reported $68,000 in wages, along with withholdings, on its federal and state tax forms, the only checks in evidence from

10

Defendants to Ingvarsdóttir during that year totaled $2,760. JA109–10, 137–38

¶¶ 25, 29; SA11, 14, 59–64, 70–71, 75. For 2009, although Datalink reported to

the IRS that it paid Ingvarsdóttir $66,000, no such wages were reported to New

York State, and no withholdings were reported to either federal or state authorities.

JA109–11, 116, 137–38 ¶ 25e; SA13–16, 72, 75.

In her testimony, Ingvarsdóttir confirmed that in 2006, Datalink issued her

six payments, each for $460, totaling $2,760, but she did not recall receiving any

other wages from Defendants thereafter. JA139 ¶ 31c; SA26–27. Other payments

she received were not "wages," but "pass-through" "dividend payments" from an

entity called Seashell Realty, LLC. JA139 ¶ 31d; SA28–29. She also received

"sporadic[]" cash payments from Bedi to buy groceries and to pay Bedi's maid.

*Id.* ¶ 31e, SA32–33, 37.

### C. Criminal Activity by Defendants and Ingvarsdóttir

In November 2010, Bedi and Ingvarsdóttir were arrested and charged in

New York State court for grand larceny in connection with a scheme to defraud a

Datalink client, Roger Davidson. JA135 ¶ 13, 140 ¶ 34; SA6, 22, 24, 34. Bedi, on

behalf of himself and Datalink, pleaded guilty to first degree grand larceny, and

was sentenced to three to nine years of imprisonment. JA144 ¶ 5; SA6, 93, 96.

Ingvarsdóttir pleaded guilty to second degree grand larceny, and received a

sentence of five years of probation. JA144 ¶ 4; SA35–36, 104–05, 110 ¶ 10.

### D. Evidence of Ingvarsdóttir's Coercive Employment Relationship and Bedi's Abuse

During the administrative proceedings before DOL, Ingvarsdóttir presented evidence that her employment with Defendants was at least to some degree coercive; that Bedi fostered an environment where she was entirely dependent on him, economically and otherwise; and that she was a victim of Bedi's abuse. Specifically, she testified that she was required to perform numerous domestic tasks for Bedi and his mother at their home, which she characterized as "continuous servant work." SA24–25. Ingvarsdóttir lived with Bedi and his mother, and testified that she was forced to sleep on the floor. SA23–25. According to her testimony, she received "sporadic" payments from Bedi "on rare occasion" to pay for household expenses such as cleaning services and groceries. SA32–33, 37. She also testified that she "would work whatever hours Vickram Bedi worked . . . probably from 9:00 or 10:00 in the morning until midnight; 1 or 2 o'clock sometimes," SA21, and that Bedi thwarted opportunities for her to obtain other employment, including by harassing her and pursuing her to, and retrieving her from, her native Iceland on multiple occasions. SA30–31.

The evidence in the record other than Ingvarsdóttir's testimony also supports Ingvarsdóttir's contention that Bedi abused her. The Westchester County District Attorney—the same authority that criminally prosecuted her—certified under penalty of perjury that she suffered "prolonged, continuous abuse at the hands of

12

Vickram Bedi, including both [sic] physical, mental and verbal abuse," and assisted her effort to obtain a U visa, which is reserved for victims of certain crimes, including domestic violence, who are helpful to law enforcement.  SA78–81; *see generally* 8 C.F.R. § 214.14.[3]  Likewise, Ingvarsdóttir was offered an opportunity to provide her views at Bedi's parole hearing, reflecting the District Attorney's view that she was Bedi's victim.  SA84–85.  The Westchester County Supreme Court also issued orders of protection for Ingvarsdóttir against Bedi.  SA88–90.  Finally, in an evaluation submitted with Ingvarsdóttir's summary judgment motion before the ALJ, a domestic violence expert opined that Ingvarsdóttir was "the victim of an insidious and violent decade of coercive control perpetrated by Mr. Bedi," was "isolated, physically assaulted, emotionally abused and psychologically terrorized," "had no support system nor resources to turn to for help," and, as a result, "was in fact without decision making, input, control or responsibility for Vickram's behavior including his defrauding of Roger Davidson."  SA97 (quoting from report).[4]

---

[3] DHS approved Ingvarsdóttir's U Visa petition.  SA110 ¶ 13, 114–15.

[4] The complete evaluation from which this publicly-filed quotation was excerpted, as well as additional materials regarding Ingvarsdóttir's allegations that Bedi abused her, can be found in the portions of the administrative record that were filed under seal with the district court.  JA7; ECF Nos. 49, 50, 51.  Given that these details are sensitive and are only relevant on appeal—if at all—to Defendants' *in pari delicto* argument, *see infra* Argument § III.B, the United States has not

## III.    PROCEDURAL HISTORY

### A. Administrative Proceedings

Ingvarsdóttir filed a complaint with WHD in 2012, alleging that she "receiv[ed] virtually no wages" from Datalink for her work from 2005 to 2010. JA135 ¶ 13; SA118–19.  Following an investigation, WHD issued a written determination on April 6, 2012, finding that Defendants failed to pay $237,066.06 in wages required by their LCAs and the H-1B statute and regulations.  JA135 ¶ 14; SA40–43.  The determination directed that unless Defendants timely requested a hearing, they were to submit the back wages to WHD for distribution, in the form of a check payable to either Ingvarsdóttir or "Wage-Hour Labor." JA135 ¶ 14; SA40.

Ingvarsdóttir and Defendants each requested an ALJ hearing.  JA97, 136 ¶ 16.  In addition to Ingvarsdóttir, WHD was a prosecuting party in the ALJ proceeding.  JA96.  A hearing was held in two parts, the first, consisting of the vast majority of testimony and the presentation of exhibits, on July 25, 2013, and the second, consisting exclusively of telephonic testimony from Bedi, who was incarcerated, on September 17, 2013.  JA97.

Following post-hearing briefing, the ALJ issued a decision holding both

---

included them in its Supplemental Appendix but instead refers the Court to the sealed pages of the record to the extent the Court wishes to review them.

Defendants jointly and severally liable for back wages, plus pre- and post-judgment interest. JA96–122. Because she had doubts regarding the credibility of both Bedi and Ingvarsdóttir, the ALJ relied primarily on federal and state tax records for evidence of the wages paid, informed by testimony of a WHD investigator and Ingvarsdóttir's certified public accountant. JA101–02, 110. Based on these records, the ALJ found that between 2005 and 2011, Defendants paid Ingvarsdóttir only $2,760 in wages within the meaning of the H-1B regulations. JA110–13, 116–17.

The ALJ further determined that Defendants' obligation to pay Ingvarsdóttir continued until her visa expired on May 15, 2011, because Defendants did not effect a *bona fide* termination. JA112–13. The ALJ agreed with Defendants, however, that no wages were owing for periods when Ingvarsdóttir was unavailable for work during visits to Iceland and while she was in jail after her arrest. JA113–14. Crediting those periods of unavailability and the $2,760 in wages that Defendants paid within the meaning of the regulations, the ALJ calculated Defendants' back-wage liability as $341,693.03, plus pre- and post-judgment interest. JA116–17. Applying New York law and ARB precedent, the ALJ determined that Bedi was individually liable, jointly with Datalink, due to factors such as Bedi's key role in signing the LCA attestations; his decision to underpay Ingvarsdóttir; his status as Datalink's sole shareholder; his "complete

15

control" of the corporation; and Datalink's lack of corporate formalities. JA114–16. Any other conclusion, the ALJ reasoned, would "allow Mr. Bedi to remain unanswerable for the actions of Datalink" and "constitute fundamental unfairness." JA115.

Defendants appealed the ALJ's decision to the ARB. JA125. On February 29, 2016, the ARB affirmed the ALJ's decision, with a slight downward revision of the back-wage amount to $340,987.43, exclusive of interest, to account for three days in 2006 when Ingvarsdóttir was unavailable but that the ALJ had not subtracted from the award. JA124–32.[5]

### B. Defendants' Opposition to Ingvarsdóttir's Efforts to Enforce the ARB's Order in State Court

On July 6, 2016, pursuant to the expedited procedures of New York Civil Practice Law and Rule ("CPLR") 3213, Ingvarsdóttir filed a motion for summary judgment in lieu of a complaint in New York State Supreme Court, seeking to collect her back wages pursuant to the ARB's final order. *Ingvarsdóttir v. Bedi*, No. 155571/2016, 2016 WL 7031446, 2016 N.Y. Slip Op. 32359(U), at *1 (Sup. Ct. N.Y. County Dec. 2, 2016) (*Ingvarsdóttir I*).[6] The court denied the motion,

---

[5] The $340,987.43 figure does not appear in the ARB's decision, but the parties have agreed on the pre-interest amount in controversy. JA11 ¶ 4, 64 ¶ 3.

[6] The decision does not mention the date of the motion, but the date is referenced in a later motion. Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. CPLR 3212, *Ingvarsdóttir,* 2017 WL 1542177 (filed Jan. 3, 2017) ("Pl.'s CPLR 3212 Mem.").

16

accepting Defendants' argument that because the ARB's order was still subject to potential judicial review under the Administrative Procedure Act ("APA"), it was not "incontestable," which the court held was required under CPLR 3213. *Id.* at *3.[7] The court accordingly converted Ingvarsdóttir's CPLR 3213 motion into a complaint. *Id.* at *5.

Ingvarsdóttir renewed her motion for summary judgment, this time under the standard New York summary judgment procedures of CPLR 3212. Pl.'s CPLR 3212 Mem., *Ingvarsdóttir,* 2017 WL 1542177. She contended that notwithstanding the inapplicability of CPLR 3213, she could still collect the back wages in the absence of a stay issued by the ARB or a federal court. Defendants opposed, contending that Ingvarsdóttir lacked a cause of action to enforce the ARB's award in state court and that she had other "collection remedies outside this

---

[7] CPLR 3213 provides that "[w]hen an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint." It seeks "to provide quick relief on documentary claims so presumptively meritorious that a formal complaint is superfluous, and even the delay incident upon waiting for an answer and then moving for summary judgment is needless." *Ingvarsdóttir v. Bedi*, No. 15571-2016, 2017 WL 1438265, at *3 (Sup. Ct. N.Y. County Apr. 24, 2017) ("*Ingvarsdóttir II*") (internal citations and quotation marks omitted). According to the court, in Ingvarsdóttir's case, "[t]he presumptively meritorious nature of the ARB Award was absent for purposes of CPLR 3213 relief given that the potential of an appellate order that might disturb the Award existed." *Id.*

forum." Defs.' Mem. in Supp. Cross-Mot. to Dismiss, *Ingvarsdóttir*, 2017 WL 1542178 (filed Feb. 10, 2017) ("Defs.' CPLR 3212 Opp. Mem."). On April 24, 2017, the court denied Ingvarsdóttir's summary judgment motion and granted Defendants' motion to dismiss. *Ingvarsdóttir II*, 2017 WL 1438265.

### C. District Court Proceedings

On October 19, 2017, the United States filed a complaint, including a Certificate of Indebtedness, against Defendants in the United States District Court for the Northern District of New York. JA11–14. On June 1, 2018, the district court denied Defendants' motion to dismiss. JA51–61. The district court, relying on this Court's decision in *E.D.P.*, concluded that the back wages at issue are a "debt" that the United States may collect using the FDCPA. JA58–61. On January 28, 2019, the district court denied Defendants' motion to certify the denial of the motion to dismiss for an interlocutory appeal. *United States v. Bedi*, No. 1:17-cv-1168, 2019 WL 356546 (N.D.N.Y. Jan. 28, 2019). On February 13, 2019, Defendants filed their answer and a counterclaim challenging the ALJ and ARB's decisions under the APA. JA62–65.

On April 8, 2020, the district court granted the United States' motion for summary judgment and denied Defendants' cross-motion. JA148–65. The district court reiterated that the FDCPA authorizes the United States to collect the back wages and that the debt is not subject to "a limited exception for debts arising from

18

purely private agreements." JA158–59. The court also rejected Defendants'

arguments that equitable principles bar the United States from collecting the debt,

noting that Defendants had not shown any "egregious" misconduct by the United

States or that the United States bears "substantially equal responsibility" for the

criminal activities in which Defendants and Ingvarsdóttir were involved, and

further observing that the misconduct that gave rise to Defendants' debt—their

violation of the H-1B wage requirements—was completely separate from those

criminal activities. JA159–60. After rejecting the remainder of Defendants'

arguments against enforceability, JA160–62, the district court upheld the ARB's

affirmance of the ALJ's decision under APA review, concluding that the ALJ's

factual findings were supported by substantial evidence, and that the ALJ relied on

appropriate factors when resolving witness credibility and when concluding that

Bedi was personally liable. JA163–64. The district court entered judgment on

April 21, 2020. JA166. This appeal followed.[8]

---

[8] On appeal, Defendants argue only that the court erred in concluding that
Defendants' obligation is a debt under the FDCPA, and that the court should not
have rejected their *in pari delicto* defense. *See* Brief for Defendants–Counter-
Claimants-Appellants (Oct. 26, 2020) ("Appellants' Br.") 11–25; Appellants' Pre-
Arg. Stmt., Addendum B (July 6, 2020). They do not reprise their other arguments
against enforceability, and likewise do not challenge the district court's upholding
of the ARB and ALJ's conclusion that Defendants violated their LCAs and the H-
1B statute and regulations. Accordingly, they have waived all other arguments.
*See JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418,

## SUMMARY OF THE ARGUMENT

The district court properly concluded that the outcome of this case is controlled by this Court's decision in *E.D.P.* that when a federal agency seeks to enforce an administrative order to pay back wages owed under a federal statute, the back-wage award reflects a public, rather than a private, obligation, and therefore is a "debt" under the FDCPA. As the text and legislative history of the FDCPA establish and the case law reflects, the applicability of the FDCPA turns on the source of the debt, not, as Defendants assert, on the party to whom payment will ultimately flow.

Here, as in *E.D.P.*, Defendants' debt derives from the federal government's enforcement of a labor law for which the federal government has exclusive enforcement authority; it does not derive from a private contract between Defendants and Ingvarsdóttir. Therefore, Defendants' obligation is a debt under the FDCPA.

Nothing in the FDCPA's language restricts its application to debts whose collection would benefit the United States financially. While providing a financial benefit to the United States is one purpose of the FDCPA, its central aim is to establish an effective, uniform system for the collection of federal debts, which

---

428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court[.]").

20

otherwise would be subject to inconsistent, and often ineffective, state collection regimes. The relief the United States seeks in this case is in keeping with that purpose and with the objectives of the INA, which would be thwarted if the United States is not permitted to enforce collection of Defendants' debt. The Supreme Court's decision in *Nathanson v. NLRB* does not require a contrary result, and this Court should therefore decline Defendants' invitation to reverse the district court's decision in this case or to overturn its own binding precedent in *E.D.P.* Lastly, Defendants' argument that *E.D.P.* is distinguishable because Ingvarsdóttir can enforce the debt herself, presumably in state court, relies on an incorrectly narrow reading of *E.D.P.*, is unsupported and speculative, and is subject to judicial estoppel given that Defendants successfully took the opposite position when Ingvarsdóttir tried to do just that.

Defendants' *in pari delicto* argument fails on numerous counts. Defendants entirely disregard their own burden in asserting this affirmative defense and the exacting standard for its application. It is undisputed that the plaintiff, the United States, has not engaged in any misconduct that would trigger application of this equitable doctrine. And Defendants' assertion that the United States "stands in the shoes" of Ingvarsdóttir, and thus must answer for her criminal conduct, relies on the easily distinguishable context of a bankruptcy trustee. Here, unlike in bankruptcy, the United States' interests are not identical to those of an H-1B

complainant like Ingvarsdóttir, and her conduct is thus irrelevant to whether the United States may maintain this action.

Moreover, even if Ingvarsdóttir's crimes could somehow be imputed to the United States, Defendants have provided no evidence that would justify application of *in pari delicto*. First, the state-law larceny that Ingvarsdóttir and Defendants committed against one of Datalink's clients was not, as the *in pari delicto* doctrine requires, part of "the unlawful activity that is the subject of this suit," which is Defendants' violation of the INA and their LCAs by failing to pay Ingvarsdóttir the required wage. Additionally, even if these two unlawful activities could somehow be conflated, Defendants have provided no evidence that Ingvarsdóttir's criminal conduct was "substantially equal" to Defendants'. The record compels the opposite conclusion. Bedi was convicted of the more serious offense and received a harsher sentence. Ingvarsdóttir was dependent on Bedi, who was her employer and H-1B sponsor. And there is substantial evidence in the record—including a certification by the District Attorney who prosecuted Bedi and Ingvarsdóttir—that Bedi abused Ingvarsdóttir, and that this abuse may have mitigated her culpability in the criminal scheme that Bedi orchestrated.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a district court's grant or denial of summary judgment *de novo*. *Mullins v. New York*, 653 F.3d 104, 113 (2d Cir. 2011).

### II.    DEFENDANTS' OBLIGATION IS SUBJECT TO THE FEDERAL DEBT COLLECTION PROCEDURES ACT.

#### A. Like the Back-Wage Award in *E.D.P.*, Defendants' Debt Is an Amount Owing to the United States under the FDCPA Because It Is a Public Obligation, Not a Purely Private One.

The outcome of this case is controlled by *E.D.P.,* in which this Court held that a National Labor Relations Board ("NLRB") award of back wages in an administrative proceeding under the NLRA was "a debt owing to the United States" under the FDCPA. 6 F.3d at 954–55. Examining the FDCPA's text and legislative history, the Court observed that "debt is defined broadly" but was not intended to include "purely private . . . obligations." *Id.* (internal quotation marks and citations omitted). It cited the Supreme Court's recognition that the NLRB is "'a public agency acting in the public interest, not any private person or group, not any employee or group of employees'" and acts "'as a public agent, not to give effect to a private administrative remedy'" when it enforces the NLRA. *Id.* at 955 (*quoting Amalgamated Util. Workers v. Consol. Edison Co.*, 309 U.S. 261, 265, 269 (1940)). The Court also pointed out that "[e]ffective debt collection by the government is not only to fill the public coffers and lower the federal budget

23

deficit" but is also "a necessary tool for enforcement of the federal labor laws," and noted that the NLRB was "the only entity allowed to enforce" the back-wage order. *Id.* Because the NLRB acted "in the public's interest and not those of private individuals," it was "not a mere conduit" to the workers, and therefore, this Court concluded, the wages were a debt to the United States under the FDCPA. *Id.*

Defendants' debt under the INA is practically indistinguishable from the obligation in *E.D.P.*, and as such constitutes "restitution, damages, . . . or [an]other source of indebtedness to the United States" under the FDCPA. 28 U.S.C. § 3002(3)(B).[9] In enforcing the H-1B wage requirements of the INA, DOL, like the NLRB, acts to vindicate the public interest. This is particularly true given that, as discussed above, the H-1B wage requirement's overarching purpose is not to bestow a benefit on the foreign H-1B workers who are the private beneficiaries of any back-wage awards, but instead to protect American workers whose employment opportunities and conditions would otherwise be adversely affected. *See, e.g.,* 65 Fed. Reg. at 80,110 (requirement's purpose is "to protect U.S. workers' wages and eliminate any economic incentive or advantage in hiring temporary foreign workers"); *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602

---

[9] The United States agrees that Defendants' debt is not "owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States." 28 U.S.C. § 3002(3)(A).

24

F.3d 189, 198 (3d Cir. 2010) (DOL's enforcement of H-1B statute "vindicate[s]"

rights that "are of a 'public' nature, since [DOL] is acting to protect the U.S.

workforce from displacement by H–1B recipients and to enforce the rules of the

immigration system.").

Consistent with its role vindicating the public interest rather than acting as a

mere conduit for employees, DOL investigates complaints from aggrieved H-1B

employees only if it finds reasonable cause, and its initial determination is subject

to multiple levels of administrative review.  20 C.F.R. §§ 655.806(a)(2), 655.820,

655.845.  As such, DOL's ultimate ruling is not always consistent with the wishes

of the private complainant.[10]  Indeed, DOL defends its H-1B decisions against

APA challenges not only from employers—as was the case here—but also from

employees.  *See, e.g.*, *Gupta v. Perez*, 101 F. Supp. 3d 437 (D.N.J. 2015).

Additionally, under both the NLRA and INA, employees lack a private right

of action against employers and instead must file a complaint with the relevant

government enforcement agency, which has exclusive authority to enforce

employers' obligations through a comprehensive administrative scheme.  *See, e.g.,*

*Watson*, 196 F. App'x at 307–08; *Venkatraman*, 417 F.3d at 422–24 (no private

right of action for employees under H-1B provisions of INA); *Amalgamated Util.*

---

[10] Here, for example, the ALJ and ARB rejected Ingvarsdóttir's arguments that she
was entitled to additional wages for time she spent in Iceland.  JA113–14, 129.

25

*Workers*, 309 U.S. at 265–70 (no private right of action for employees under the NLRA because "Congress has entrusted to the Board exclusively the prosecution of the proceeding by its own complaint, the conduct of the hearing, the adjudication and the granting of appropriate relief"). This similarity further supports reaching the same conclusion in this case as this Court reached in *E.D.P.*

Finally, the public nature of an H-1B back-wage debt is arguably *greater* than that of an analogous debt under the NLRA. Under the NLRA, a back-wage award seeks to approximate whatever the employer would have paid the affected employees, consistent with any private wage agreements, but for its prohibited labor practices. *N.L.R.B. v. Consol. Bus Transit, Inc.*, 577 F.3d 467, 477 (2d Cir. 2009); 29 U.S.C. § 160(c). In contrast, the wages due in an H-1B enforcement proceeding—the greater of the prevailing or actual wage—derive from the statute, regulations, and LCAs, not any private agreement. 8 U.S.C. § 1182(n)(1)(A)(i).[11] Because "H-1B wages are fixed by statute, not by contract,'" JA159 (citing *Kutty v. U.S. Dep't of Labor*, No. 3:05-cv-510, 2011 WL 3664476, at *9 (E.D. Tenn. Aug. 19, 2011)), Defendants' obligation here, even more so than in *E.D.P.*, is to the United States, not to a private party.

---

[11] Accordingly, regardless of whether any private contract requires it, as discussed above, an H-1B employee's required wage must include payment for nonproductive time under most circumstances, until the employer effects a *bona fide* termination. 8 U.S.C. § 1182(n)(2)(C)(vii); 20 C.F.R. § 655.731(c)(7).

26

In sum, because DOL, under a comprehensive and exclusive administrative enforcement scheme, furthers public, rather than private, interests when enforcing H-1B's wage requirements; and because this litigation is the final step in "effective collection as a necessary tool for enforcement of [a] federal labor law[]," *E.D.P.*, 6 F.3d at 955, the H-1B statute bears all of the hallmarks this Court has identified as compelling FDCPA coverage of a back-wage debt, even if the money will ultimately be remitted to a private employee. Because the public character of an H-1B back-wage debt at least equals, if not exceeds, that of the NLRA back-wage debt in *E.D.P.*, Defendants' debt resulting from DOL's enforcement efforts is subject to the FDCPA.

**B. The District Court's Decision and *E.D.P.* Are Consistent with the Text and Purpose of the FDCPA and INA.**

**1. The Language of the FDCPA Indicates that the Critical Factor in Determining Whether an Obligation Is a Debt Under the FDCPA Is What the Debt's Source Is, Not the Party to Whom the Amount Ultimately May Flow.**

The FDCPA defines "debt," in relevant part, as "an amount that is owing to the United States on account of . . . restitution, damages, . . . or other source of indebtedness to the United States, but that is not owing under the terms of a contract *originally entered into* by only persons other than the United States." 28 U.S.C. § 3002(3)(B) (emphasis added). By excluding from the definition amounts owing under the terms of a contract "originally entered into" by private parties, this

27

statutory language makes clear that the source of the debt is the critical factor in determining whether an obligation is a debt under the FDCPA. As explained by Representative Jack Brooks, then-Chairman of the House Committee on the Judiciary and the FDCPA's sponsor, this statutory language means that the FDCPA does not reach "obligations *which begin* as *purely private* loan or contract obligations[.]" 136 Cong. Rec. H13288-02 (Oct. 27, 1990) (emphasis added); *see id.* (describing, as an example of an obligation outside the FDCPA's scope, a scenario where a borrower takes out a loan from a non-federally-operated bank, but the bank later fails and is taken over by the federal government).

The case law interpreting the FDCPA similarly reflects that whether the FDCPA encompasses a debt turns on whether the debt's source is a public or private obligation, not whether its final destination is the government or a private party. As the Ninth Circuit explained, "[t]he FDCPA provides procedures allowing the government 'to recover a judgment *on a debt*,' which indicates that the focus should be on the source of the debt." *U.S. Small Bus. Admin. v. Bensal*, 853 F.3d 992, 1001 (9th Cir. 2017) (quoting 28 U.S.C. § 3001(a)(1)) (emphasis in opinion); *see also id.* at 1002 (the FDCPA "was intended to reach debt arising from transactions in which the federal government was originally a party").

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Construction Corp.*, 509 F.3d 216 (5th Cir. 2007), on which Defendants rely, also supports this principle. In

28

*Sobranes*, a construction company defaulted on a note it had executed in favor of a bank that was placed into federal receivership. *Id.* at 217–18. The Federal Deposit Insurance Corporation ("FDIC"), to which the bank's assets were transferred, sued the company and obtained a judgment. *Id.* at 218.[12] The Fifth Circuit ruled that the judgment was not an amount owing to the United States within the meaning of the FDCPA because the FDCPA's scope does not include "those amounts owing to the United States that find their genesis in contracts where the United States was not an original party," and "the note underlying the FDIC's judgment was originally entered into by only private parties"—the construction company and the bank—even though the FDIC later came to own it. *Id.* at 223.

Although *Sobranes* characterized "the position taken by the *E.D.P.* majority" as "unsatisfactory," the court expressly declined to state whether it would have reached the same outcome as this Court if it had confronted the facts of *E.D.P.* *Id.* at 227. And just as importantly, the Fifth Circuit in *Sobranes* explicitly distinguished, and reaffirmed, a prior holding it had characterized as "consistent with" *E.D.P.* *Id.* at 226; *FTC v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 320 n.5 (5th Cir. 2004). In *National Business Consultants*, the Fifth Circuit held that the Federal Trade Commission ("FTC") *could* use the FDCPA to collect a

---

[12] The judgment was assigned to a private party, Sobranes, for collection, a factor the Fifth Circuit did not address in its FDCPA analysis. *Sobranes*, 509 F.3d at 227.

29

judgment consisting mostly of damages that would be paid to individual business franchisees whom the defendant defrauded. 376 F.3d at 320.[13] The Fifth Circuit in *Sobranes* explained:

> The critical distinction between this case and *National Business Consultants* is that here the FDIC was seeking only to recover under the terms of a contract originally entered into by private parties, whereas in *National Business Consultants* the FTC was vindicating its independent statutory authority to enforce the [Federal Trade Commission Act]. That is, the judgment the FTC recovered was not "owing under the terms of a contract" between private parties even if the private contracts provided the impetus for the lawsuit; rather, *the amount owing to the United States existed because of the [Federal Trade Commission Act]*.

*Sobranes*, 509 F.3d at 226 (emphasis added).

*United States v. Bongiorno*, 106 F.3d 1027 (1st Cir. 1997), similarly supports interpreting the FDCPA as turning on a distinction between a debt that owes its existence directly to the enforcement of a federal statute by a federal agency vindicating the public interest, and a debt whose source is not federal law and that was originally owed by one private party to another. *Bongiorno* concerned whether the federal government could use the FDCPA to collect "restitution" pursuant to the Child Support Recovery Act ("CSRA"), which

---

[13] Specifically, the judgment included about $3 million in damages reflecting "consumer loss" that would go to private parties, *National Business Consultants,* Reply Brief for Appellants, 2004 WL 2619617, at *1 (filed Jan. 12, 2004), plus attorney's fees and costs for the FTC whose value was estimated at "hundreds of thousands of dollars," *id.*; *National Business Consultants*, Brief for the Appellee, 2003 WL 23873977, at *16 (filed Dec. 23, 2003).

30

criminalized the willful failure to pay child support for a child residing in another State. *Bongiorno*, 106 F.3d at 1030. Like the note in *Sobranes*, the CSRA restitution at issue in *Bongiorno*—back child support payments—was not federal in origin, even though it was ordered by a federal court. Rather, the CSRA defined the "past due support obligation," which comprised the restitution, as "any amount determined under a court order or an order of an administrative process *pursuant to the law of a State* to be due" for child support. 18 U.S.C. § 228(d)(1)(A) (1994) (emphasis added). Thus, the CSRA restitution order was not a federal obligation, but merely federal enforcement of a state-law obligation from one private party to another. *Accord Bongiorno*, 106 F.3d at 1032 ("[C]hild support orders that require a parent in one state to make payments to a person in another state are functionally equivalent to interstate contracts[.]"). In concluding that the restitution was not a debt under the FDCPA, the First Circuit noted that the government's "belated" and "peripheral involvement" could not transform the private child support obligation into a federal debt. *Bongiorno*, 106 F.3d at 1040 n.12.[14]

_____

[14] Defendants also cite *Bongiorno* for their contention that "the relevant inquiry when determining the reach of the FDCPA [is] 'to whom the debt is owed and to whose benefit the proceeds of the debt will inure when it is paid.'" Appellants' Br. 20 (quoting *Bongiorno*, 106 F.3d at 1037). While the First Circuit did adopt this distinction, the United States submits that it is unpersuasive as it is inconsistent not only with *E.D.P.*, but also with *Sobranes* and Representative Brooks' statement, under which a debt originating in a private transaction is not subject to the FDCPA even if, due to subsequent events, its payment would directly benefit the federal

31

As *E.D.P.*, *Sobranes*, *National Business Consultants*, and *Bongiorno* all demonstrate, if the source of an obligation is a contract between two private parties, then it is outside the scope of the FDCPA even if federal legislation creates a role for the United States in recovering the amount and even if the payments benefit the federal government. On the other hand, if the source of the obligation is an agreement with the federal government or the federal government's enforcement of federal legislation—particularly if the United States has exclusive enforcement authority—then it is a debt under the FDCPA even if its payment may ultimately benefit private parties.

### 2. The Source of Defendants' Debt Is the INA and Defendants' LCAs, Not Any Private Contract with Ingvarsdóttir.

Defendants' debt exists because of the H-1B statute and Defendants' LCAs. This case is therefore analogous to *E.D.P.* and *National Business Consultants*, where the underlying statute at issue was the source of the obligation, and not to *Sobranes* or *Bongiorno,* which both involved private debts later converted by intervening events into government obligations.

---

government. *See infra* Argument, § II.B.3. And since, as discussed above, the *source* of the debt in *Bongiorno* was non-federal, the First Circuit's "ultimate beneficiary" test was unnecessary as well as incorrect.

32

Defendants' H-1B wage obligations arose under their federal statutory and regulatory obligations, not under any private contract between Ingvarsdóttir and Defendants.[15] As explained above, the requirement to pay the higher of the prevailing or actual wage is in the H-1B statute itself. 8 U.S.C. § 1182(n)(1)(A)(i). And to the extent that a private contract purports to permit an employer to pay an H-1B worker less than required by statute, the statute controls. *Kutty*, 2011 WL 3664476, at *9 ("Regardless of the private contracts, [the employer] had to pay the 'required wage,' as set forth in the INA."); *see also* 65 Fed. Reg. at 80,171 ("Nor will [DOL] relieve an employer from liability simply because the employee agreed to periods without pay in the employment contract.").

Even viewing Defendants' obligations as stemming only from the LCAs themselves (as opposed to the statute and regulations), those obligations are nonetheless covered by the FDCPA. LCAs are not contracts between private parties. *See Gupta*, 101 F. Supp. 3d at 461 n.32 ("[T]he LCA is not considered an employment contract for the purposes of a breach of contract claim.") (citing

---

[15] As the district court pointed out, Defendants have never produced any written contract between themselves and Ingvarsdóttir, and any oral contract for Ingvarsdóttir's wages for the six-year time period at issue would be unenforceable under New York's statute of frauds. JA158–59; *see* N.Y. Gen. Oblig. L. § 5-701(a)(1). Defendants fail to explain how their debt can be "under the terms of a contract" between themselves and Ingvarsdóttir, and thereby excluded from the reach of the FDCPA under section 3003(3)(B), when no such written contract is in the record and no such oral contract could have existed under New York law.

33

cases). The only signatories to Defendants' LCAs were Defendants and DOL. SA45–48, 52–55; *cf. Bensal*, 853 F.3d at 1002 (the FDCPA "was intended to reach debt arising from transactions in which the federal government was originally a party"). An H-1B worker like Ingvarsdóttir is not a party to the LCAs at all, but at most a third-party beneficiary. *See Compunnel Software Grp., Inc. v. Gupta*, No. 14-civ-4790, 2015 WL 1224298, at *5 (S.D.N.Y. Mar. 17, 2015). Thus, the United States' involvement in this matter is neither "peripheral" nor "belated," *Bongiorno*, 106 F.3d at 1040 n.12; in the absence of their LCAs, as signed and certified by DOL, Defendants were not permitted to employ Ingvarsdóttir as an H-1B worker. 8 U.S.C. § 1182(n)(1) (prohibiting admission of aliens on H-1B visas unless the employer files an LCA); *id.* § 1324a (prohibiting employment of unauthorized aliens).

In sum, Defendants' debt here did not begin as a purely private contract obligation, the only exception to the FDCPA's expansive definition of debt. Defendants' obligation began with the H-1B program requirements, which constitute binding federal law on Defendants, and the LCAs signed by Defendants and the federal government. *Compare Sobranes*, 509 F.3d at 223 (concluding that the judgment in that case was not covered by the FDCPA because it did "not create an obligation between the debtor and holder that is independent of the note"). The FDCPA therefore encompasses Defendants' debt.

34

### 3. Neither the FDCPA's Language Nor Its Purpose Limits Debts Under the Statute to Those That Benefit the United States Financially.

There is no merit to Defendants' contention, Appellants' Br. 11–12, that their obligation cannot be an "amount owing to the United States" because, should the United States prevail in this litigation, it will disburse the back wages and interest that it collects to Ingvarsdóttir, a private party. The FDCPA contains no language indicating that the existence, or lack thereof, of a financial benefit to the United States is determinative of whether an obligation is "owing to the United States" within the meaning of the statute. To the contrary, as noted above, the statutory language explicitly provides that obligations like the debt in *Sobranes* that originate from private transactions but later become owned by the federal government are *outside* the FDCPA's scope *even though* payment of those debts would financially benefit the United States. It is simply not relevant under the statutory language that the back-wage award here will ultimately be disbursed to an employee rather than deposited in the federal treasury.

The legislative history supports a conclusion that the FDCPA is not limited to debts that will fill public coffers. While one of Congress's purposes in enacting the FDCPA was surely to shore up the federal treasury, *see* Appellants' Br. 16, this singular concern does not suggest that the scope of an FDCPA "debt" turns on the existence of a financial benefit to the government. *See Diamond v. Chakrabarty*,

35

447 U.S. 303, 315 (1980) ("a statute is not to be confined to the particular application[s] . . . contemplated by the legislators'") (internal quotation marks omitted); *E.D.P.*, 6 F.3d at 955 (federal debt collection "is not only to fill the public coffers" but is also "a necessary tool for enforcement of the federal labor laws").

In addition to shoring up the public fisc, the FDCPA was enacted to provide uniformity and efficiency in the enforcement of federal law. As noted by Representative Brooks, "Federal laws giving rise to obligations are governed by uniform standards. But [prior to the FDCPA], the standards and procedures for collecting judgments on those obligations [were] determined by State law." 136 Cong. Reg. H13288-02. As early as the 1970's, it was recognized that "the diversity of state law with respect to Federal debt collection was . . . interfering with efficient enforcement activity." H.R. Rep. No. 101-736 (Sept. 21, 1990). A series of General Accounting Office studies in the late 1980's "identified and reinforced" the problems that "diverse state law" posed to federal debt collection. *Id.* Congress responded by enacting the FDCPA to establish "a uniform federal framework for the collection of Federal debts in the Federal courts." *Id.; see Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 117 (2d Cir. 2010) (explaining that the FDCPA was "enacted 'to give the [United States] *uniform Federal procedures* . . . to collect debts owed the United States

36

nationwide,'" which marked a "change from [the] pre-FDCPA scheme of reliance on diverse state procedural rules") (quoting H.R. Rep. No. 103-883, at 81 (Jan. 2, 1995)) (emphasis in opinion). Congress incorporated this purpose into the statute's language itself, stating that the FDCPA "provides the *exclusive civil procedures* for the United States" to recover a judgment on a debt. 28 U.S.C. § 3001(a) (emphasis added).

Moreover, as a general matter, Congress intended for the terms "debt" and "United States" in the FDCPA to be construed "broadly." H.R. Rep. 101-736 ("'Debt' is defined broadly to include . . . amounts originally due the United States." . . . 'United States' is defined broadly to include any entity or instrumentality of the United States as well as any corporation."). This weighs against the narrow construction of "debt" that Defendants urge. *See S.E.C. v. ICP Asset Mgmt., LLC*, No. 10-civ-4791, 2012 WL 204098, at *4 (S.D.N.Y. Jan. 24, 2012) (rejecting argument to construe scope of FDCPA narrowly). Rather, the district court's conclusion, applying this Court's precedent in *E.D.P.,* is consistent with "the statutory structure of [the FDCPA] and [its] legislative purpose and history." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) (internal quotation marks omitted).

The FDCPA's rationale of uniformity and efficiency applies with particular force to Defendants' debt under the H-1B statute. As shown by Ingvarsdóttir's

37

own unsuccessful collection efforts, *see supra* Statement of the Case, § III.B, even assuming *arguendo* that state-law collection remedies might be available to an H-1B complainant or the United States, such remedies would vary widely, with collection potentially being straightforward in some states and difficult or even impossible in others. Congress surely did not intend to have DOL go through years of investigations, administrative hearings, and appellate review leading to final agency action to enforce a federal labor law, only to have enforcement of its own order that an employer pay wages be left to the disparate collection regimes that the FDCPA was specifically enacted to avoid. A district court concluded similarly with regard to a discrimination judgment that the United States obtained for the benefit of eleven women under the Fair Housing Act, holding that where the United States "prosecuted the case on behalf of the women . . . [and] secured the judgment . . . [and] [t]he debt that [was] the judgment [was] owed exclusively because of the Government's efforts . . . it would be an affront to the design and purpose of [42 U.S.C.] § 3614 if the Government were permitted to bring suit on behalf of the aggrieved persons but not collect the judgment." *United States v. Veal*, No. 04-0755-cv-w-dw, 2005 WL 1532748, at *2 (W.D. Mo. June 28, 2005). *See also McBride v. Estis Well Serv., LLC*, 768 F.3d 382, 395 (5th Cir. 2014) (courts "recognize a general principle that there should be no right without a

38

remedy"), *cert. denied*, 135 S. Ct. 2310 (2015); *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) ("Congress cannot be presumed to do a futile thing.").[16]

The Immigration Act of 1990, which established the LCA requirements and the corresponding administrative procedures, made "significant changes" in the H-1B program. Alien Temporary Employment Labor Certification Process, 56 Fed. Reg. 11,705, 11,710 (Mar. 20, 1991). Defendants are asking this Court to conclude that Congress significantly reformed the H-1B program, establishing a wage requirement and a detailed and exclusive federal enforcement scheme, but did not intend for the federal government to be able to enforce that wage requirement in court. The Court should reject Defendants' attempt to use a narrow statutory construction to turn the H-1B wage requirement into a paper tiger.

### 4. *Nathanson* Is Not Inconsistent with *E.D.P.*

Nothing in the Supreme Court's decision in *Nathanson v. National Labor Relations Board*, 344 U.S. 25 (1952), requires a different result in this case or otherwise calls into question this Court's binding precedent in *E.D.P.* In

---

[16] The H-1B statute provides for civil monetary penalties for violations, which are paid to the federal government for its own benefit, 8 U.S.C. § 1182(n)(2)(C); 20 C.F.R. § 655.810(f), such that even Defendants would presumably concede that they are "debt[s]" under the FDCPA. It would be contrary to the FDCPA's goal of efficiency to have H-1B back-wage payments be subject to the vagaries of state-law collection remedies while penalties meted out in the very same administrative proceedings are enforceable under the FDCPA.

39

*Nathanson*, the NLRB ordered a company that had engaged in unfair labor practices to pay back wages to the NLRB. *Id.* at 26. The company subsequently went into bankruptcy, and the NLRB sought to collect the back wages in the bankruptcy proceeding. *Id.* The Supreme Court ruled that although the NLRB was entitled to make a claim for the amount in bankruptcy, the back wages for the benefit of the company's employees were not a "debt due to the United States" entitled to priority under the Bankruptcy Act. *Id.* at 27. As outlined below, the outcome of *Nathanson* stemmed from the unique context and purposes of bankruptcy law, and does not require a similar result under the FDCPA.

While the language used in the Bankruptcy Act and FDCPA is similar,[17] "[t]he Supreme Court has repeatedly affirmed that 'identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute.'" *United States v. Watkins*, 940 F.3d 152, 165 (2d Cir. 2019) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion)). A "statute's context—both textual and historical" can mean that certain language is meant to convey a different meaning from the same or similar language

---

[17] Although the United States does not contend that the difference is dispositive, the statutory language in *Nathanson* provided that "debts due to the United States" would be satisfied first if a debtor is insolvent, 31 U.S.C. § 191 (1952), while the language in FDCPA applies to "an amount that is owing to the United States," 28 U.S.C. § 3002(3).

40

in another statute.  *Id.* at 166; *see Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 410–11 (2d Cir. 2014) (rejecting argument that similar language in different statutes had same meaning, in part because of the statutes' different purposes); *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 171 (2d Cir. 2004) ("[T]he meaning of identical words 'well may vary to meet the purposes of the law.'") (quoting *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001)).

Such is the case here.  In *Nathanson*, the Supreme Court emphasized that the purpose of the United States' priority in the Bankruptcy Act was "'to secure an adequate public revenue to sustain the public burthens and discharge the public debts.'"  344 U.S. at 28 (quoting *United States v. State Bank of N.C.*, 31 U.S. 29, 35 (1832)).  This justified a departure from the Bankruptcy Act's overall "theme" of "equality of distribution."  *Id.* at 29 (internal quotation marks and citation omitted).  The Court further noted that the Bankruptcy Act already prioritized a limited subset of unpaid wage claims, i.e., only wages earned within three months before the commencement of bankruptcy proceedings and only up to $600 per claimant.  *Id.*  It thus concluded that reading "debts due to the United States" as encompassing an NLRB back-wage claim was unwarranted, because it would undermine the Bankruptcy Act's equal distribution principle by going beyond the

41

existing limited priority for certain wage claims specifically chosen by Congress, and because it would not "sustain the public burthens."

In contrast, the central purpose of the FDCPA, as discussed above, is to provide a uniform means for the United States to collect federal debts arising under federal law, without which such debts would be at best subject to inconsistent state law regimes, and at worst not collectable at all. The relief the United States seeks here is entirely consistent with that goal and in no way undermines the FDCPA's other purpose, strengthening the public fisc. Thus, construing Defendants' obligation as a debt under the FDCPA is consistent with the FDCPA's purposes, which would not have been the case regarding the Bankruptcy Act had the United States received priority in *Nathanson*.[18] Accordingly, *Nathanson* does not preclude a conclusion that Defendants' debt is an "amount that is owing to the United States" under the FDCPA.[19]

---

[18] In *E.D.P.*, this Court pointed to *Nathanson*'s conclusion that although the Bankruptcy Act did not give the NLRB's back-wage award priority, it nonetheless recognized that the award was a "debt, demand, or claim" in bankruptcy and that the NLRB was a creditor, in part because it was the only party entitled to enforce the award. 6 F.3d at 955. *E.D.P.* concluded that this supported its conclusion that the NLRB's back-wage award was a debt to the United States under the FDCPA. *Id.*

[19] Defendants seek to overturn this Court's longstanding and binding precedent in *E.D.P.* because they contend it is inconsistent with *Nathanson* (as well as *Sobranes* and *Bongiorno*). Appellants' Br. 14–22. The Court should reject Defendants' attempt. As explained above, *Nathanson*, *Sobranes*, and *Bongiorno* are consistent

42

**C. *E.D.P.* Is Not Limited to Circumstances Where the Government is the Only Party that Can Enforce the Underlying Order, and Even if it Were, Defendants' Contention that Ingvarsdóttir Can Enforce the ARB's Order Is Both Unsupported and Barred by Judicial Estoppel.**

As an alternative to reversing *E.D.P.*, Defendants suggest that this case is distinguishable because Ingvarsdóttir can collect the ARB's award, whereas in *E.D.P.*, the NLRB was the only party that could enforce its order. Appellants' Br. 12–13. The Court should reject Defendants' argument for multiple reasons. First, *E.D.P.* is not limited to circumstances where a private beneficiary of an administrative award has no mechanism by which to collect it. Second, Defendants' assertion that Ingvarsdóttir can enforce the ARB's order is unsupported and entirely speculative. And finally, to the extent that Defendants assert that Ingvarsdóttir may enforce the ARB's order herself, they are estopped

---

with the result this Court reached in *E.D.P.* And in the absence of any intervening Supreme Court decision calling *E.D.P.* into question, the principle of *stare decisis* weighs strongly in favor of affirming the district court's decision. *See California v. FERC*, 495 U.S. 490, 499 (1990) (noting that "considerations of *stare decisis* have special force in the area of statutory interpretation, for . . . unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free" to change the statute if it disagrees with how a court has interpreted it); *Deem v. DiMella-Deem*, 941 F.3d 618, 624 (2d Cir. 2019) (published panel decisions are binding on future panels of this Court unless they are overruled *en banc* or by the Supreme Court, or unless an intervening Supreme Court decision creates a "conflict, incompatibility, or inconsistency" with this Court's precedent).

43

from making this argument by their successful opposition to her attempts to do so previously.

Defendants misread *E.D.P.* as limiting the applicability of the FDCPA to instances where the government is the only party that can enforce the obligation. That the NLRB was "the only entity allowed to enforce the relief ordered" was only one of several facts supporting this Court's ultimate conclusion that "the Board acts in the public's interest and not those of private individuals," and that "precisely" for that reason, the back wages awarded by the NLRB were "a debt to the United States under the FDCPA." *E.D.P.*, 6 F.3d at 951. As discussed above, this principle applies equally here, where DOL, acting pursuant to its exclusive statutory authority to enforce federal requirements to further the public interest, seeks to collect a debt stemming from its own administrative adjudication under the INA.

Moreover, even assuming that *E.D.P.* could be read as narrowly as Defendants suggest, Defendants cite no source of law supporting their assertion that Ingvarsdóttir "clearly" may enforce the ARB's award. Appellants' Br. 13. The United States takes no position on whether, as a matter of the law of New York or any other state, Ingvarsdóttir may bring a claim at some point to collect her back wages and whether such a claim would succeed. But Defendants have failed to support their assertion with any statute, case, or authority providing

44

Ingvarsdóttir with a means of collection. This cursory approach is fatal to their position. *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue" that would preclude summary judgment).

Further, when Ingvarsdóttir sought to enforce the ARB's award in in the New York State Supreme Court ("State Court"), Defendants successfully argued that she could not do so. Contrary to Defendants' contention, Appellants' Br. 13, the State Court did not merely accept Defendant's arguments that Ingvarsdóttir's attempts to enforce the ARB's order were premature since the award was not yet "incontestable." This characterization applies only to the State Court's *first* ruling, in 2016, denying Ingvarsdóttir's motion under the expedited procedures of CPLR 3213. *Ingvarsdóttir I*, 2016 WL 7031446, at *3. But after Ingvarsdóttir subsequently moved under the standard summary judgment procedures of CPLR 3212, Defendants took their arguments further, contending that that "the DOL Judgment is neither recognizable nor enforceable in New York," that Ingvarsdóttir had "identifie[d] no mechanism, express or implicit, pursuant to which the DOL Award may be converted into a New York judgment," and—perhaps most notably—suggesting that DOL, not Ingvarsdóttir, was the appropriate party to enforce the ARB's award. Defs.' CPLR 3212 Opp. Mem., *Ingvarsdóttir*, 2017 WL 1542178 (arguing that Ingvarsdóttir "evidently does have collection remedies

45

outside [State Court]," citing *Ingvarsdóttir I*, 2016 WL 7031446 at \*3 n.1, which quoted a letter from WHD stating that "*the Administrator may seek appropriate collection remedies*" to enforce its order).[20]  The State Court accepted Defendants' arguments and dismissed the case, *Ingvarsdóttir II*, 2017 WL 1438265, and Defendants' brief in this Court does not address this ruling or their arguments that brought it to fruition.

Accordingly, Defendants' unsupported and vague suggestion in this Court that Ingvarsdóttir has "standing" to enforce the ARB's order is barred by judicial estoppel, which dictates that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (internal quotation marks and alterations removed).  The Supreme Court has identified three factors

---

[20] Strangely, Defendants blamed Ingvarsdóttir for her predicament, arguing that she "bears the consequences of the litigation choices she made," that "[s]he chose to seek an administrative order from an agency of the United States, rather than assert claims in state court, such as for breach of contract," and that "[i]f recognition and enforcement of an order by New York courts were crucial to her, she could and should have considered how she would fare under Articles 53 and 54 [of the CPLR]."  Defs.' CPLR 3212 Opp. Mem., *Ingvarsdóttir*, 2017 WL 1542178.  Of course, as noted earlier, Ingvarsdóttir had no "litigation choice;" an employee's exclusive remedy for violations of the INA is to file a complaint with DOL, and an LCA violation does not give rise to a breach-of-contract claim.

46

that "typically inform" a decision whether to apply judicial estoppel: (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the court in the earlier proceeding adopted the party's former position; and (3) whether the party asserting the two positions "would derive an unfair advantage" against the party seeking estoppel. *Id.* at 750–51 (internal quotation marks omitted). This Court requires that at least the first two of these factors must be met, and additionally that "the risk of inconsistent results with its impact on judicial integrity" be "certain." *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 148 (2d Cir. 2005) (internal quotation marks omitted).

These factors are satisfied here. Defendants' position in State Court that the ARB's award is unenforceable there, and even more so their suggestion that DOL may enforce the award, are "clearly inconsistent" with their arguments to this Court that it is Ingvarsdóttir who "clearly has standing to enforce [the ARB's decision]" and that the FDCPA—the means by which the federal government collects its debts—provides the DOL with no such remedy. Additionally, the State Court adopted Defendants' positions when it dismissed Ingvarsdóttir's case. *Ingvarsdóttir II*, 2017 WL 1438265, at *5. Finally, Defendants would "derive an unfair advantage," with a "certain" "impact on judicial integrity," if their position here is accepted. *New Hampshire,* 532 U.S. at 751; *Uzdavines,* 418 F.3d at 148. At bottom, Defendants attempt to evade entirely the effect of DOL's order in both

47

state and federal court, each time arguing that they are being sued in the wrong forum by the wrong party. These contradictory positions seek to effectively nullify DOL's years-long efforts, affirmed by the district court, to hold Defendants to account for their significant violations of the H-1B wage requirements to the tune of hundreds of thousands of dollars.

In short, whether Ingvarsdóttir can enforce the ARB's order is not relevant under *E.D.P.*, but even if it were, Defendants have provided no support for their assertion that Ingvarsdóttir can do so, and are estopped from making such an argument by the positions they previously took.

### III. DEFENDANTS HAVE FAILED TO SHOW THAT THE *IN PARI DELICTO* DOCTRINE PRECLUDES THE UNITED STATES FROM ENFORCING THE ARB'S ORDER.

#### A. The Plaintiff in This Action—the United States—Participated in No Wrongdoing and Does Not Stand in Ingvarsdóttir's Shoes.

This Court has explained that "the doctrine of *in pari delicto,* a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014).[21] Defendants would bear the burden of proving this

---

[21] Defendants assert, citing case law outside this Circuit, that "[i]t is well-settled that courts will not assist one felon in recovering money allegedly owed by another felon as a result of the commission of a crime." Appellants' Br. 23. This Court

affirmative defense at trial. *See G4S Int'l Emp't Servs. (Jersey), Ltd. v. Newton-Sealey*, 975 F.3d 182, 187 (2d Cir. 2020) ("It is well-established that a defendant . . . bears the burden of proving its affirmative defense.") (internal quotation marks and citation omitted); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (characterizing *in pari delicto* as an affirmative defense). Thus, the United States is entitled to summary judgment against this defense if it shows that there is an absence of evidence to support an essential element of Defendants' case. *See F.D.I.C. v. Giammettei*, 34 F.3d 51, 55 (2d Cir. 1994).

Defendants have never argued, nor can they, that the actual plaintiff in this action—the United States—participated together with Defendants in any wrongdoing. Rather, they argue that the *in pari delicto* doctrine applies to the United States because it "stands in the shoes" of Ingvarsdóttir. Appellants' Br. 23–25. Defendants' argument, however, is misplaced, and relies on easily distinguishable case law.

In the only case decided by this Court that Defendants cite in support of this argument, the Court concluded that the *in pari delicto* principle barred the

---

has not articulated *in pari delicto* in this fashion, and in any event, Defendants have not met this standard, since, as discussed below, the United States, not Ingvarsdóttir, is the party seeking to recover the debt, and the debt here is not owed "as a result of the commission of a crime."

bankruptcy trustee of a company that engaged in illegal conduct from asserting claims on behalf of the company for wrongdoing in which the company participated. *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Sec. LLC)*, 721 F.3d 54, 58 (2d Cir. 2013). This holding was premised on the "*Wagoner* rule," *id.* at 63–64, which says that "[u]nder the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy[,]" *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). *See also Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) ("[B]ecause a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in."). As a result, for purposes of the *in pari delicto* principle, the company's transgressions are the trustee's.

This is not a bankruptcy case, and Defendants cite no authority for their assertion that the United States or DOL "stands in the shoes" of an H-1B worker in an enforcement matter. To the contrary, as discussed at length above, an aggrieved H-1B worker like Ingvarsdóttir cannot enforce the INA herself; she must instead file a complaint with DOL, which, pursuant to its exclusive authority to enforce the H-1B statute and regulations, adjudicates the complaint and may or may not do so in the complainant's favor. Defendants' *in pari delicto* argument thus fails as a

50

matter of law because the United States, not Ingvarsdóttir, is the party whose conduct is relevant, and Defendants do not allege that the United States engaged in any conduct that would trigger the application of this doctrine.

> **B. Even if Ingvarsdóttir's Conduct Could be Imputed to the United States, Defendants Have Failed To Show, as They Must Under This Affirmative Defense, that the Debt Sought in This Action Resulted from the Criminal Activity at Issue or that Any Misconduct by Ingvarsdóttir Is Equal to Their Own Misconduct.**

Even assuming *arguendo* that Ingvarsdóttir's conduct were relevant here, there is no evidence to support the essential elements of Defendants' *in pari delicto* defense, and the defense therefore does not preclude summary judgment in the United States' favor. *Giammettei*, 34 F.3d at 55. "The doctrine of *in pari delicto* means more than just 'two wrongs make a right.'" *BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218 (2d Cir. 2006). Even if Ingvarsdóttir were the relevant party, Defendants would have to show both that she was "'an active, voluntary participant in the unlawful activity *that is the subject of the suit*'" and that her wrongdoing was "*at least substantially equal* to that of the defendant[s]." *Id.* (quoting *Pinter v. Dahl,* 486 U.S. 622, 636 (1988)) (emphasis added). Defendants' argument fails both prongs of this test, and tellingly, their brief does not even recite, let alone attempt to meet, this demanding standard.

First, the conduct to which Ingvarsdóttir pleaded guilty—defrauding a wealthy Datalink client—is not "the unlawful activity that is the subject of this

51

suit." The subject of the instant suit is Defendants' failure to comply with the H-1B statute and regulations and their LCAs. As the district court concluded, Defendants' argument conflates two unrelated issues: larceny and required wage payments. JA159–60; *see BrandAid Mktg. Corp.*, 462 F.3d at 218 (rejecting *in pari delicto* defense where, "whatever misrepresentations [the plaintiff] may have made about its condition, there [was] no suggestion that this in any way caused [the defendant] to . . . [engage in the] fraud and other chicanery on which [the plaintiff's] claims [were] premised"); *Jacoby-Bender, Inc. v. Jacques Kreisler Mfg. Corp.*, 287 F. Supp. 134, 135 (S.D.N.Y. 1968) ("[I]f [the] plaintiff's offenses are merely collateral, [the] plaintiff may still recover for [the] defendant's wrongs, for the fact that [the] plaintiff himself may have sinned in some other connection does not make him an outlaw, deprived of all legal rights.").

Second, Defendants have not pointed to any evidence that Ingvarsdóttir bore any responsibility, let alone was *equally* culpable, for Defendants' decision to violate their binding commitments to the government in the LCAs. And even if it were proper to examine the parties' criminal conduct in the fraudulent scheme for purposes of applying the *in pari delicto* defense, Defendants fail to show how Ingvarsdóttir's conduct was "at least substantially equal to" their own. To the contrary, while Defendants point to Ingvarsdóttir's *second*-degree larceny conviction—for which she received only probation, SA104–05, 110 ¶ 10—they

52

also plainly admit, as they must, Bedi's own conviction and imprisonment for the *more serious* offense of *first*-degree grand larceny. Appellants.' Br. 5; *see* N.Y. Penal Law §§ 155.40, 155.42.[22]

It strains credulity to presume, without any evidentiary foundation, that Ingvarsdóttir's wrongdoing was at least substantially equal to that of Bedi, on whom she was dependent not only for employment and legal status but also for food, shelter, and other necessities. SA21, 23–25, 32–33, 37. Indeed, the record contains considerable evidence that Ingvarsdóttir's criminal culpability may have been, at least to some degree, mitigated by her physical and psychological abuse by Bedi and the coercive employment and domestic environment that he fostered. *See supra* Statement of the Case, § II.D. The same District Attorney who secured her criminal conviction for second-degree larceny also assisted her in petitioning for a U visa because of Bedi's abuse of her. SA78–81.[23] On this record, even viewing the evidence in the light most favorable to Defendants, an *in pari delicto* affirmative defense cannot survive summary judgment. *See BrandAid Mktg.*

---

[22] Defendants erroneously assert that Ingvarsdóttir was sentenced to a prison term; the record does not support this proposition. JA144-45 ¶ 6.

[23] The United States, like the District Attorney, does not contend that these factors absolve Ingvarsdóttir of her guilt, but rather that they underscore that Defendants have failed to establish substantial equality of wrongdoing, as required for their *in pari delicto* defense.

53

*Corp.*, 462 F.3d at 219 (rejecting defense where "[plaintiff's] omissions pale[d] in comparison to defendants' fraudulent scheme").

To overcome this insufficiency, Defendants turn the burden of proof on its head, contending that the United States "pointed to no evidence" that "Datalink was in some way a legitimate business" and that the wages to which Ingvarsdóttir was entitled "were something other than criminal proceeds." Appellants' Br. 25. But Defendants have pointed to no evidence to support their own case, as they must to avoid summary judgment. *Giammettei*, 34 F.3d at 55. While Defendants and Ingvarsdóttir undoubtedly engaged in criminal activity during Ingvarsdóttir's employment at Datalink, Defendants have certainly not presented any evidence that Datalink was entirely illegitimate, or that all of the wages owed to Ingvarsdóttir were the product of criminal activity. On the contrary, Defendants expressly *admitted* that "Datalink sold computers and provided computer services," and that "Defendants hired [Ingvarsdóttir] to work with Datalink's customers and perform administrative work." JA134.

Finally, the *in pari delicto* doctrine and similar equitable defenses are disfavored where they would "seriously undermin[e]" a federal enforcement scheme. *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968) (plurality op.) (concerning antitrust enforcement), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984); *accord McKennon*

54

*v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) (doctrine of unclean hands "has not been applied where Congress authorizes broad equitable relief to serve important national policies"); *Atl. Limousine, Inc. v. NLRB*, 243 F.3d 711, 716 (3d Cir. 2001) (notwithstanding employee misconduct, federal labor law award was necessary to vindicate the "remedial underpinnings" of federal labor law and to avoid windfall to employer for its own misconduct); *Hartman Bros. Heating & Air Conditioning v. NLRB*, 280 F.3d 1110, 1116 (7th Cir. 2002) (rejecting unclean hands defense to NLRA claim).

As noted above, the INA and implementing regulations narrowly limit the circumstances when an H-1B employer is exempt from its otherwise-binding attestations in the LCAs to pay the prevailing wage. This is because relieving an employer of its obligations would be inconsistent with the purposes of the H-1B wage requirements, which serve to protect American workers as well as the H-1B workers themselves, who due to their immigration status are at an inherent disadvantage if their employer engages in unscrupulous practices.[24] As a result,

_____

[24] For example, an H-1B worker might agree to go along with an employer's misconduct—accept lower wages than required, misrepresent job titles and responsibilities—in order to remain in the United States. Here, Bedi was at any time free to terminate Ingvarsdóttir's employment, which in turn would have deprived her of her legal status. And Ingvarsdóttir was even more dependent on her employer than a typical H-1B worker, given her testimony that she performed much of her work at Bedi's home, where she also lived, "sleeping on the floor." JA139 ¶ 31b; SA19, 21, 24–25.

55

DOL has rejected arguments made by H-1B employers seeking to carve out equitable exceptions to the wage requirement. *See WHD v. Integrated Geophysics, Corp.*, ARB Case No. 2019-0001, 2020 WL 3146470, at *2 & n.3 (ARB May 13, 2020) (awarding back wages despite H-1B employee's awareness that she had been working on her employer's incorrect LCA for her own benefit); *Varess v. Persian Broad. Serv. Glob., Inc.*, ARB Case No. 2018-0023, 2019 WL 5102146, at *4 (ARB Sept. 26, 2019) (an "employee's alleged misconduct does not affect [an employer's] duty to pay [the employee] the wage set in the LCAs"); *Adm'r v. Efficiency Corp.*, ARB Case No. 15-005, 2016 WL 4718917, at **7–9 (ARB Aug. 4, 2016) (rejecting employer's argument that employee's alleged wrongdoings relieved the employer of its obligations to pay the employee the wage listed in the LCA). Because the government's enforcement of the H-1B LCAs "vindicate[s]" "rights" of a "'public nature," pursuant to a Congressional mandate, *Cyberworld Enter. Techs.*, 602 F.3d at 198, Defendants are not entitled to an exemption from these carefully drawn requirements by pointing to an unrelated offense, much less one in which they have failed to show that Ingvarsdóttir's criminal culpability is at least as serious as their own.[25]

---

[25] On appeal, Defendants do not raise the related, but distinct, principle of "unclean hands," as they did in the district court. *See Republic of Iraq*, 768 F.3d at 168 (noting that "[a]though the doctrines of unclean hands and *in pari delicto* are often mentioned in the same breath, they are 'distinct terms for . . . distinct situations.'")

**CONCLUSION**

For the foregoing reasons, this Court should affirm the judgment of the district court.

Dated: January 25, 2021                    Respectfully submitted,

                                           STANLEY E. KEEN
                                           Deputy Solicitor for National
                                           Operations

                                           JENNIFER S. BRAND
                                           Associate Solicitor

                                           RACHEL GOLDBERG
                                           Counsel for Appellate Litigation

                                           s/ Jesse Z. Grauman
                                           JESSE Z. GRAUMAN
                                           Senior Attorney

                                           U.S. Department of Labor
                                           Office of the Solicitor
                                           200 Constitution Avenue, N.W.
                                           Room N-2716

---

(quoting *Perma Life Mufflers, Inc.*, 392 U.S. at 153 n.1 (Harlan, J., concurring in part and dissenting in part)).  Accordingly, this argument has been waived.  *JP Morgan Chase Bank*, 412 F.3d at 428.  In any event, the points discussed above apply equally to the "unclean hands" doctrine, which applies where the party seeking relief "has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine."  *PenneCom B.V. v. Merrill Lynch & Co., Inc.*, 372 F.3d 488, 493 (2d Cir. 2004) (applying New York law) (internal quotation marks and citations omitted).  The United States has committed no wrongdoing, let alone an "unconscionable act," it does not stand in Ingvarsdóttir's shoes, and even if it did, as explained above, her crime of larceny was not "directly related to the subject matter in litigation," and there is no evidence that it injured Defendants.

Case 20-1955, Document 52, 01/25/2021, 3020326, Page72 of 75

Washington, D.C.  20210
(202) 693-5563
grauman.jesse.z@dol.gov

58

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(a) and Local Rule 32.1, the undersigned certifies that this brief complies with the applicable type-volume limitation, typeface requirements, and type-style requirements.

1. This brief complies with the type-volume limitations of Local Rule 32.1 because the brief contains 13,920 words, excluding exempt portions.

2. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2016 with 14-point Times New Roman font in text and footnotes.

Dated: January 25, 2021

s/ Jesse Z. Grauman
JESSE Z. GRAUMAN

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2021, a true and correct copy of the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system, which will send notification of such filing to:

Alan Lewis
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Email: lewis@clm.com

Leonardo Trivigno
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Email: trivigno@clm.com

Dated: January 25, 2021                          s/ Jesse Z. Grauman
                                                 JESSE Z. GRAUMAN

# ADDENDUM

Pursuant to Federal Rule of Appellate Procedure 28(f), 28 U.S.C. § 3002(3) is reproduced below:

(3) "Debt" means—

(A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or

(B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States;

and includes any amount owing to the United States for the benefit of an Indian tribe or individual Indian, but excludes any amount to which the United States is entitled under section 3011(a).

61